## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Chapter 13 |
| TANVEER A. KHAN | ) | |
| | ) | |
| | ) | Case No. 16-bk-14863 |
| | ) | |
| Debtor. | ) | |
| | ) | Honorable Janet S. Baer |

### NOTICE OF MOTION

**To**: Consumers Credit Union, successor by merger to Andigo Credit Union c/o Sean Rathjen (CEO), 1075 Tri-State Parkway, Suite 850, Gurnee, IL 60031 (via Certified U.S. Mail);
Esp Kreuzer Cores LLP c/o Christine M. Ryan (via ECF);
Diaz Anselmo & Associates, LLC c/o Nisha B. Parikh (via ECF); and
Chapter 13 Trustee (via ECF)

**PLEASE TAKE NOTICE** that on **October 15, 2021, at 09:30 AM**, I will appear before the Honorable Janet S. Baer, or any Judge sitting in her place, and present **Debtor's Motion for Civil Contempt and Sanctions for Violations of the Automatic Stay, Confirmation Order, the Discharge Injunction, and Fed. R. Bank. P. 3002.1(b),** a copy of which is attached.

**This Motion will be presented and heard electronically using Zoom for Government**. No personal appearance in court is necessary or permitted. To appear and be heard on the motion, you must do the following:

**To appear by video,** use this link: https://www.zoomgov.com/. (2) Enter the meeting ID **160 731 2971**. (3) Enter the passcode **587656**.

**To appear by telephone,** call Zoom for Government at (669) 254-5252 or (646) 828-7666. (2) Enter the meeting ID **160 731 2971**. (3) Enter passcode **587656.**

**When prompted identify yourself by stating your full name.**

**To reach Judge Baer's web page go to** www.ilnb.uscourts.gov **and click on the tab for Judges.**

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the Motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without hearing.

TANVEER A. KHAN

By: *Mohammed O. Badwan*

Mohammed O. Badwan, Esq.
*Counsel for Debtor*
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Suite 250
Lombard, IL 60148
Phone (630) 575-8180
mbadwan@sulaimanlaw.com

## **CERTIFICATE OF SERVICE**

I, Mohammed O. Badwan, certify/declare under penalty of perjury under the laws of the United States of America that I served a copy of this notice and the attached motion on each entity shown on this notice at the address shown and by the method indicated on the notice on September 27, 2021.

*/s/ Mohammed O. Badwan*

`

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Chapter 13 |
| TANVEER A. KHAN | ) | |
| | ) | |
| | ) | Case No. 16-bk-14863 |
| | ) | |
| Debtor. | ) | |
| | ) | Honorable Janet S. Baer |

**DEBTOR'S MOTION FOR CIVIL CONTEMPT AND SANCTIONS FOR VIOLATIONS
OF THE AUTOMATIC STAY, CONFIRMATION ORDER, THE DISCHARGE
INJUNCTION, AND FED. R. BANK. P. 3002.1(b)**

**NOW COMES** TANVEER A. KHAN ("Debtor"), by and through his undersigned counsel, and pursuant to 11 U.S.C. §524, 11 U.S.C. §105, Fed. R. Bankr. P. 9020, and Fed. R. Bankr. P. 9014, bringing the instant Motion for Civil Contempt and Sanctions for Violations of the Automatic Stay, Confirmation Order, the Discharge Injunction, and Fed. R. Bankr. P. 3002.1(b) against CONSUMERS CREDIT UNION, successor by merger to ANDIGO CREDIT UNION ("Andigo")[1], as follows:

**NATURE OF THE MOTION**

1.    The Debtor is one of many victims of Andigo's systemic practice of violating the terms of confirmed Chapter 13 plans and discharge orders. Specifically, as set forth below, Andigo chronically misapplies post-petition mortgage payments to pre-petition arrears, ultimately causing bankruptcy debtors to fall into a default status on the their mortgage loans as soon as the bankruptcy case is successfully completed.

---

[1] Pursuant to a merger in 2020, Andigo is now Consumers Credit Union.

2.     As a result of Andigo's practices, Debtor and other bankruptcy debtors were never appropriately deemed current after the successful completion of their Chapter 13 plans, and therefore never received the fresh start contemplated by the Bankruptcy Code.

3.     The Debtor successfully completed his Chapter 13 Plan and obtained a bankruptcy discharge on June 7, 2021. Despite the Debtor's successful completion of his Chapter 13 case, which cured all pre-petition arrears on the Debtor's mortgage loan, Andigo mercilessly bombarded the Debtor with default notices and threats to foreclosure on his family home. Andigo's brazen conduct is in contempt of the Automatic Stay, Order Confirming Debtor's Chapter 13 Plan, and the Discharge Order entered by this Court.

4.     The Debtor brings this Motion to enforce the discharge injunction and to enjoin Andigo from (1) further collection activity directed at the Debtor and his family home and (2) filing a foreclosure proceeding, which has been repeatedly threatened.

## FACTUAL BACKGROUND

5.     In June 2007, the Debtor executed a mortgage and promissory note ("subject loan") in favor of Motorola Employees Credit Union ("MECU").

6.     The subject loan was taken out to fund the  purchase of the Debtor's principal residence located at 2321 Loop Rd., Algonquin, IL 60102 ("subject property").

7.     From the inception of the subject loan, the loan was a non-escrow loan and the Debtor was responsible for paying the real estate taxes and maintaining his own insurance policy on the subject property.

8.     In 2012, the Debtor filed a Chapter 7 bankruptcy and ultimately received a Chapter 7 discharge on August 20, 2012 (Case No. 12-15839).

9.    At the time the Debtor obtained his Chapter 7 discharge, the Debtor was current on the subject loan.

10.    The Chapter 7 discharge extinguished the Debtor's personal liability on the subject loan.

11.    In 2012, facing a financial hardship, the Debtor defaulted on the subject loan.

12.    On April 30, 2016, the Debtor filed the instant Chapter 13 case.  [Dkt. 1]

13.    Also on April 30, 2016, the Debtor filed a Chapter 13 Plan. [Dkt. 8]

14.    The Debtor's Chapter 13 plan, *inter alia*, proposed to cure the default on the subject loan while making the ongoing mortgage payments as they became due. Id.

15.    At the time the Debtor filed his original Chapter 13 plan, the Debtor was $54,163.03 in arrears on the subject loan.

16.    The filing of the Debtor's bankruptcy case triggered the protections of the Automatic Stay pursuant to 11 U.S.C. §362(a).

17.    Accordingly, MECU was prohibited from taking any action to collect a pre-petition debt from the Debtor directly (e.g. arrears, etc.). *See* 11 U.S.C. §362(a)(6).

18.    At all times relevant, the Debtor made every post-petition payment (in full) that became due on the subject loan.

19.    On May 17, 2016, the very next month after the Debtor's bankruptcy filing, MECU sent the Debtor a mortgage statement asserting (1) an "overdue amount" of $45,347.16 and (2) that the Debtor was late on his mortgage payments. The mortgage statement further stated that the Debtor needed to bring the loan current to avoid losing his home. Moreover, the mortgage statement asserted that the Debtor had a negative escrow balance of $23,445.60.

20.     The May 2016 mortgage statement distressed the Debtor as he believed that the bankruptcy automatic stay protected him from collection activity such as the May 2016 mortgage statement.

21.     In June 2016, MECU sent the Debtor another mortgage statement alleging a default and threatening foreclosure.

22.     On June 14, 2016, MECU filed a proof of claim in the amount of $356,496.99. The proof of claim further asserted (1) mortgage arrears in the amount of $54,163.03 and (2) a monthly mortgage payment in the amount of $1620.58 (principal and interest). *See* Claim 5-1.

23.     Notably, the alleged default asserted in the May 2016 mortgage statement was nearly $10,000 less than the amount asserted by MECU in Proof of Claim 5-1.

24.     In the summer of 2016, MECU changed its name to Andigo Credit Union.

25.     In June, July, August, and September 2016, MECU sent the Debtor mortgage statements alleging that Debtor is in default and that failure to cure the default would result in the loss of his home.

26.     In October 2016, Andigo sent the Debtor a mortgage statement asserting an "overdue amount" of $45,959.55 and that Debtor was late on his mortgage payments. The mortgage statement further stated that Debtor needed to bring the loan current to avoid losing his home. Moreover, the mortgage statement asserted that Debtor had a negative escrow balance of $36,052.79.

27.     On October 26, 2016, Andigo filed a first amended proof of claim in the amount of $356,496.99. The first amended proof of claim similarly asserted (1) mortgage arrears in the amount of $54,163.03 and (2) a monthly mortgage payment in the amount of $1,620.58 (principal and interest). *Id*.

28.     In November 2016, Andigo sent the Debtor a mortgage statement alleging a default of **$47,516.13.** Notably, the alleged default was ***increasing*** despite the fact that Debtor was current on his post-petition mortgage payments (compare October 2016 mortgage statement to November 2016 mortgage statement). Moreover, the mortgage statement reflected that Andigo was placing Debtor's payments in a suspense account and not applying the payments to principal and interest.

29.     In December 2016 and January 2017, Andigo sent the Debtor mortgage statements alleging a default in excess of $45,000 and asserting a "total amount due" in excess of $46,000. The statements further stated that Debtor's failure to bring the loan current may result in the loss of his home.

30.     On January 23, 2017, the Debtor filed a Modified Chapter 13 Plan. [Dkt. 43].

31.     The Debtor's Modified Plan proposed to cure the default on the subject loan in the amount $54,163.03 while making the ongoing mortgage payments on the subject loan as they became due. *Id*.

32.     Notably, the default listed in the Debtor's Modified Plan is precisely the same amount asserted by MECU in Claim 5-1 and Claim 5-2.

33.     MECU did not object to the Debtor's Modified Chapter 13 Plan.

34.     On February 10, 2017, the Bankruptcy Court confirmed the Debtor's Modified Chapter 13 plan ("Confirmed Plan"). [Dkt. 49]

35.     The Confirmed Plan required MECU to apply the Debtor's post-petition payments "according to the terms of the mortgage…..beginning with the first payment due after the filing of the case." [Dkt. 43]

36. Throughout 2017, Andigo continued to send the Debtor mortgage statements that (1) alleged a default; (2) demanded payment in excess of $23,000; and (3) threatened that the Debtor's failure to pay the default may result in the loss of Debtor's home.

37. Most of the statements reflected that Andigo was not immediately applying the Debtor's post-petition payments to principal and interest, and instead was holding the payments in a suspense account as "unapplied funds."

38. Moreover, some of the statements reflected that Andigo was erroneously applying some of the Debtor's payments to a non-existent escrow account for taxes and insurance.

39. On June 25, 2018, Andigo filed a Notice of Mortgage Payment Change, which reflected an increase of the monthly mortgage payment from $1,657.63 to a staggering **$3,080.70**, effective July 13, 2018. *See* Claims Register, Claim 5.

40. According to the Notice of Mortgage Payment Change, the increase was due to (1) an increase in the interest rate and (2) a "new escrow payment" of $1,258.03.

41. As set forth above, the subject loan was never an escrowed loan and the Debtor has always been responsible for paying the real estate taxes and maintaining an insurance policy on the subject property.

42. During the bankruptcy, the Debtor paid all the real estate taxes that became due and maintained an insurance policy on the subject property.

43. Throughout 2018, Andigo sent the Debtor mortgage statements that (1) alleged a default, and (2) demanded a monthly mortgage payment of $3,080.70 (inclusive of $1,258.03 for taxes and insurance).

44. Most of the statements reflected that Andigo was not immediately applying Debtor's post-petition payments to principal and interest, and instead was holding the payments in a suspense account as "unapplied funds."

45. On February 27, 2019, Andigo filed a Notice of Mortgage Payment Change, which reflected an increase of the monthly mortgage payment from $3,080.70 to $3,171.98, effective April 1, 2019. *See* Claims Register, Claim 5. According to the Notice of Mortgage Payment Change, the increase was due to an increase in the interest rate.

46. In January, February, and March 2019, Andigo sent the Debtor mortgage statements that (1) alleged a default, and (2) demanded a monthly mortgage payment of $3,080.70 (inclusive of $1,258.03 for taxes and insurance).

47. The mortgage statements reflected that Andigo was not immediately applying the Debtor's post-petition payments to principal and interest, and instead was holding the payments in a suspense account as "unapplied funds."

48. Moreover, some of the mortgage statements reflected that Andigo was assessing default fees to the subject loan (e.g. property inspection fees, etc.). Notably, Andigo did not seek the Court's approval for the post-petition fees it was assessing to the subject loan.

49. In April 2019, Andigo sent the Debtor a mortgage statement that inexplicably sought a monthly payment of $2,028.96 as opposed to the $3,171.98 amount reflected in the Notice of Mortgage Payment Change filed in February 2019. Notably, Andigo failed to file a Notice of Mortgage Payment Change to reflect the change in the mortgage payment.

50. The mortgage statement further reflected that Andigo was holding $3,174.90 in a suspense account as "unapplied funds" and alleged a default of $20,513.16.

51.     From May 2019 through May 2021, Andigo sent the Debtor mortgage statements that alleged a default in excess of $17,000. Most of the mortgage statement reflected that Andigo (1) assessed default fees to the subject loan (e.g. property inspection fees, etc.) and (2) applied some of the Debtor's post-petition payments to a non-existent escrow account.

52.     Some of the statements reflected a change in the monthly mortgage payment. Notably, Andigo again failed to file a Notice of Mortgage Payment Change.

53.      On May 3, 2021, the Chapter 13 Trustee filed a Notice of Payment of Final Mortgage Cure Under Rule 3002.1(f) stating that "[t]he amount required to cure the default on [Andigo's claim] has been paid in full" and requiring Andigo to file a statement indicating whether (1) it agrees that the Debtor has cured the pre-petition default, and (2) the Debtor is current on the post-petition payments. [Dkt. 62]

54.     On May 24, 2021, Andigo filed a Response to Notice of Final Cure Payment erroneously asserting (1) that the Debtor is not current on post-petition mortgage payments, and (2) a post-petition default of $14,743.44.

55.     Attached to Andigo's Response to Notice of Final Cure Payment was a payment history that reflected the payments that became due during the bankruptcy and the payments made by the Debtor.

56.     Andigo's Response to Notice of Final Cure Payment reflected that the Debtor made **62 payments** during the bankruptcy.

57.     On May 26, 2021, the Chapter 13 Trustee filed a Notice of Completion of Plan Payments. [Dkt. 63]

58.     On June 7, 2021, the Court entered a Discharge Order granting the Debtor a discharge under §1328(a) of the Bankruptcy Code.

59. From 2017 through the present, the Debtor **repeatedly** notified Andigo of its servicing errors through phone calls and emails. In response, Andigo repeatedly ignored the Debtor's grievances and refused to (1) correct its records to reflect the Debtor's bankruptcy filing; (2) apply payments pursuant to the terms of the Confirmed Plan; and (3) apply payments in compliance with the automatic stay.

60. In one of the emails, Andigo explicitly stated that after it filed its proofs of claim, Andigo discovered that it was owed additional funds for real estate taxes it paid on behalf of the Debtor for the tax years 2014 and 2015 and that the amounts are owed despite Andigo's failure to amend its proof of claim.

61. On June 16, 2021, the Debtor sent Andigo a Request for Information ("RFI") pursuant to 12 C.F.R. §1024.36(d)(1) (Regulation X of the federal Real Estate Settlement Procedures Act) in an effort to determine (1) how Andigo was applying his mortgage payments and (2) the basis for Andigo's assertions that the subject loan remains in default despite the Debtor's faithfulness to his Confirmed Plan.

62. Pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(B), Andigo had 30 days to respond to the Debtor's RFI.

63. Anidgo failed to respond to the Debtor's RFI as required by federal law.

64. The Debtor has made **every payment (in full)** that became due on the subject loan from the date the bankruptcy was filed through the present.

### Andigo's Post-Discharge Collection Activity

65. On June 28, 2021, Andigo sent the Debtor a "Notice" of default alleging a default of $16,123.33 and threatening foreclosure proceedings. Specifically, the "Notice" stated, in pertinent part:

"Failure to pay the Cure Amount on or before August 02, 2021, may result in: 1) acceleration of all sums secured by the Mortgage to be immediately due and payable and 2) **foreclosure by judicial proceedings and sale of the mortgaged property**. If you fail to pay the Cure amount by August 02, 2021, we may, at our option, require immediate payment of all sums secured by the Mortgage without further demand, **and foreclose the Mortgage by judicial proceedings**, invoke the power of sale, assent to decree, if applicable, and/or any other remedies permitted by applicable law." (emphasis added)

66.    On June 30, 2021, Andigo sent the Debtor a correspondence again threatening foreclosure proceedings. Specifically, the correspondence stated, in pertinent part:

"This is a legally required notice. We are sending this notice to you because you are behind on your mortgage payment. We want to notify you of possible ways to avoid losing your home. **We have the right to invoke foreclosure based on the terms of your mortgage contract**. Please read this letter carefully." (emphasis added)

"We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report."

67.    In July 2021, Andigo sent the Debtor a mortgage statement alleging a default of $17,742.25. Notably, the default alleged in the statement is nearly $4,000 more than the default alleged in Andigo's Response to Notice of Final Cure Payment that was filed in May 2021.

68.    The mortgage statement further reflected that Andigo was (1) assessing default fees to the subject loan (property inspection fees) and (2) holding $6,893.02 in a suspense account as "unapplied funds." Notably, the amount held in suspense is sufficient to satisfy at least four (4) mortgage payments.

69.    The Debtor attempted to make the July 2021 payment but Andigo rejected the payment.

70.    In August 2021, Andigo sent the Debtor a mortgage statement alleging a default of $19,361.17. The mortgage statement further reflected that Andigo assessed default fees to the subject loan (property inspection fees).

71.     The Debtor attempted to make the August 2021 payment but Andigo rejected the payment.

72.     In September 2021, Andigo sent the Debtor a mortgage statement alleging a default of $20,980.09. The mortgage statement further reflected that Andigo assessed default fees to the subject loan (property inspection fees).

73.     The Debtor attempted to make the September 2021 payment but Andigo rejected the payment.

74.     Despite Debtor's relentless efforts to compel Andigo to correct its records and honor Debtor's bankruptcy, Andigo refuses to (1) investigate Debtor's meritorious grievances and fix its records and (2) honor the Debtor's bankruptcy discharge.

75.     The Debtor was left with no choice but to file the instant action to compel Andigo to honor his bankruptcy and deem the subject loan current.

## **DAMAGES**

76.     The principal reason the Debtor filed for bankruptcy was to cure the default on the subject loan and emerge from bankruptcy without the agonizing fear of losing his family home.

77.     Despite making all of his payments as prescribed by his Confirmed Plan, Andigo continues to attempt to collect amounts that were paid through the Debtor's bankruptcy.

78.     Andigo's failure to honor the Debtor's bankruptcy, the Automatic Stay, the Confirmed Plan, and the Discharge Order has significantly damaged Debtor, who is facing an imminent foreclosure filing despite being current on the subject loan.

79.     Andigo's failure to comply with the provisions of the Bankruptcy Code and the Bankruptcy Court's orders has caused the Debtor overwhelming anxiety, fear, agonizing emotional distress, mental anguish, insomnia, and physical illness.

80.     Specifically, Andigo's unlawful collection efforts have led the Debtor to believe that his bankruptcy had no legal effect and that Andigo was entitled to the amounts that were paid through his bankruptcy.

81.     As set forth above, Andigo repeatedly sent the Debtor mortgage statements and correspondences containing erroneous and false information alleging that the subject loan was in default when in fact it was current.

82.     Moreover, Andigo repeatedly sent the Debtor mortgage statements and dunning correspondences that contained information that blatantly conflicted with information contained in documents filed by Andigo in Debtor's bankruptcy case.

83.     Andigo's conduct caused the Debtor to be in a perpetual state of fear.

84.     The Debtor is especially vulnerable as he is currently caring for two sick relatives that reside with him, with one suffering from terminal cancer.

85.     The added stress caused by Andigo's conduct has brought Debtor to the brink of a mental breakdown.

86.     Moreover, Andigo's conduct has caused a significant strain on the Debtor's marriage as the Debtor is and continues to be perpetually stressed, irritable, and aggravated, therefore adversely impacting the Debtor's day-to-day interactions with his spouse.

87.     As a result of Andigo's conduct, the Debtor continues to live in perpetual fear and anxiety of losing his family home.

88.     Andigo's actions are especially egregious in light of the fact that Andigo's payment history affixed to its Response to Notice of Final Cure Payment reflects that the Debtor made all 62 payments that became due during Debtor's bankruptcy. Accordingly, Andigo should have deemed the subject loan current. Instead, Andigo (1) filed a false Response to Notice of Final Cure

Payment alleging a non-existent default and (2) continues to bombard the Debtor with never-ending default notices and threats of foreclosure.

89.     Moreover, as a result of Andigo's misapplication of the Debtor's payments, the Debtor has lost equity in his home as the misapplication of payments resulted in, *inter alia*, erroneous charges (inspection fees) being assessed to the subject loan, thus increasing the principal balance owed and decreasing the equity in the Debtor's home.

90.     The Debtor has spent countless hours attempting to persuade Andigo to correct its records and honor his bankruptcy to no avail.

91.     The Debtor will suffer irreparable harm if the Court does not compel Andigo to correct its records and honor the Debtor's bankruptcy discharge as the Debtor is in **imminent** risk of Andigo filing a foreclosure action.

92.     Debtor has been and continues to be significantly harmed by Andigo's civil contempt of the Discharge Order.

## CLASS ALLEGATIONS

93.     The Debtor  incorporates the preceding Paragraphs as fully set forth herein.

94.     The Debtor brings the class allegations and claims pursuant to Fed. R. Bankr. P. 7023 and Fed. R. Civ. P. 23, individually, and on behalf of all others similarly situated ("Putative Classes") defined as follows:

### Completed Bankruptcy Class

All persons within the Northern District of Illinois (a) that received a Chapter 13 discharge pursuant to §1328(f); (b) in which mortgage arrears to Andigo/MECU were paid in full; (c) in which after the entry of the Discharge Order, Andigo/MECU failed to deem the mortgage loan current and attempted to collect amounts paid through the Chapter 13 bankruptcy; (d) at any time in the last four years and through the date of class certification.

<u>**Payment Change Class**</u>

All persons within the Northern District of Illinois (a) whom were debtors in a Chapter 13 bankruptcy proceeding; (b) in which Andigo/MECU held a security interest in real estate that served as his/her principal residence; (c) in which Andigo/MECU failed to file a timely Notice of Payment Change as required by Fed. R. Bankr. P. 3002.1(b); (d) at any time in the last four years and through the date of class certification.

95. The following individuals are excluded from the Putative Classes: (1) any Judge or presiding over this action and members of their families; (2) Andigo, Andigo's subsidiaries, parents, successors, predecessors, and any entity in which Andigo or its parents have a controlling interest and their current or former employees, officers and directors; (3) Debtor's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Putative Classes; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Andigo have been fully and finally adjudicated and/or released.

**A. Numerosity:**

96. The exact number of members of the Putative Classes are unknown and not available to the Debtor at this time, but it is clear that individual joinder is impracticable.

97. Upon information and belief, Andigo owns/services mortgages for hundreds of consumers who fall into the definitions of the Putative Classes.

98. Members of the Putative Classes can be objectively identified from records of Andigo to be gained in discovery.

**B. Commonality and Predominance:**

99. There are many questions of law and fact common to the claims of the Debtor and the Putative Classes, and those questions predominate over any questions that may affect

individual members of the Putative Classes. Common questions for the Putative Classes include, but are not necessarily limited to the following:

A. Whether Andigo changed monthly mortgage payment amounts without providing Notice(s) of Mortgage Payment Change as required by Fed. R. Bankr. P. 3002.1(b);

B. Whether Andigo failed to properly credit payments received pursuant to confirmed Chapter 13 plans;

C. Whether Andigo failed to property apply and/or account for all payments received pursuant to confirmed Chapter 13 plans;

D. Whether Andigo failed to properly adjust principal balances after the successful completion of all payments prescribed for in Chapter 13 plans;

E. Whether Andigo generates inaccurate mortgage statements to debtors during and after Chapter 13 plans;

F. Whether Andigo attempted to collect arrearages, fees, charges, expenses, escrow, and costs paid through completed Chapter 13 bankruptcy plans;

G. Whether Andigo collected arrearages, fees, charges, expenses, escrow, and costs paid through completed Chapter 13 bankruptcy plans;

H. Whether Andigo systematically misapplies payments received during Chapter 13 bankruptcies;

I. Whether Andigo systematically attempts to collect amounts already paid through completed Chapter 13 plans; and

J. Whether Andigo systematically violates discharge orders.

**C.      Typicality:**

100.    The Debtor's claims are typical of members of the Putative Class because the Debtor and members of the Putative Classes are entitled to damages as result of Andigo's conduct.

**D.      Superiority and Manageability:**

101.    This case is also appropriate for class certification as class proceedings are superior to all other available methods for the efficient and fair adjudication of this controversy.

102.    The damages suffered by the individual members of the Putative Classes will likely be relatively small, especially given the burden and expense required for individual prosecution.

103.    By contrast, a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

104.    Economies of effort, expense, and time will be fostered and uniformity of decisions ensured.

**E.      Adequate Representation:**

105.    The Debtor will adequately and fairly represent and protect the interests of the Putative Classes.

106.    The Debtor has no interests antagonistic to those of the Putative Classes, and Andigo has no defenses unique to the Debtor.

107.    The Debtor has retained competent and experienced counsel in consumer bankruptcy litigation and consumer class action litigation.

## ARGUMENT

**I.      Andigo Should Be Sanctioned for its Willful Violations of the Automatic Stay, Confirmed Plan, and Discharge Order**

108.    "The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 367 (2007).

109. The Automatic Stay prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. §362(a).

110. "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts …. It permits the debtor … to be relieved of the financial pressures that drove him into bankruptcy." *In re Benalcazar,* 2002 Bankr. LEXIS 1240, at *12 (Bankr. N.D. Ill. 2002).

111. Provisions of the Bankruptcy Code "balance mortgage lenders' special rights with debtor rights and protections. The primary right provided to debtors is the right to cure arrearages and remain current on mortgage debt so that debtors emerge from Chapter 13 with the promised fresh start." *Rodriguez v. Countrywide Home Loans, Inc.* (*In re Rodriguez*), 2008 Bankr. LEXIS 2646, at *4 (Bankr. S.D. Tex. 2008); *see also* 11 U.S.C. §1322(b)(2) (a Chapter 13 plan may provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending).

112. Pursuant to 11 U.S.C. §1327(a), the provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan. 11 U.S.C. §1327(a).

113. "Akin to a court-approved contract, a confirmed plan binds all parties by the contract – the debtor, the trustee, and all creditors." *In re McDonald*, 336 B.R. 380, 383 (Bankr. N.D. Ill. 2006) (*citing* In re Harvey, 213 F.3d 318, 321 (7th Cir. 2000)); *see also Beskin v. McPherson*, 350 B.R. 38, 46 (Bankr. W.D. Va. 2006) ("The chapter 13 plan constitutes a new agreement between the debtor and each secured creditor. A debtor's obligations under the plan are substituted for his or her obligations under the original contract with each secured creditor").

114. "The creditor's obligation [with respect to a confirmed plan] ensure that the debtor can cure arrearages and emerge from bankruptcy no longer facing foreclosure because of default. Accordingly, the creditor must allocate payments pursuant to the plan. Improper allocation of payments deprives a debtor of the promised fresh start and rights provided by §1322(b)(5) to cure arrearages and remain current on mortgage obligations. *Rodriguez*, 2008 Bankr. LEXIS 2646, at *10.

115. "Thus, the mortgage lender must allocate payments among principal, interest, and arrearages in the manner prescribed by the plan. If a mortgage lender allocates payments that the plan dedicates to pre-petition arrearages to principal and interest or a post-petition charge, without court approval, the mortgage lender violates the terms of the plan and the lender may be subject to liability for violating the order confirming the plan." *Id*. at *10-11.

116. "Violating a confirmed plan also violates the order confirming it." *In re Ranieri*, 598 B.R. 450, Fn. 3 (Bankr. N.D. Ill. 2019).

117. "The Seventh Circuit has long recognized the sanctity of confirmation orders." *In re Lasica*, 294 B.R. 718, 721 (Bankr. N.D. Ill. 2003).

118. Pursuant to §105 of the Bankruptcy Code, the Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *See* 11 U.S.C. §105.

119. "Courts have used §105 to remedy violations of confirmed plans. A bankruptcy court's authority under §105 to enforce its own orders cannot be reasonably questioned." *Rodriguez*, 2008 Bankr. LEXIS 2646, at *62 *citing Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000).

120.    "When a confirmed plan has been ignored and undermined, §105 permits the [Bankruptcy Court] to take any action or make any determination necessary to enforce its confirmation order." *Payne v. Mortg. Elec. Registration Sys., Inc*., 387 B.R. 614, 639 (Bankr. Kan. 2008).

121.    The "bankruptcy court retains jurisdiction to protect the confirmation order, prevent interference with the execution of the plan, and otherwise aid in the plan's operation." *In re Castle Home Builders, Inc.,* 520 B.R. 98, 101 (Bankr. N.D. Ill. 2014).

122.    "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce [a creditor] into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines, Inc*., 228 F.3d at 585 quoting *United States. v. United Mine Workers of Am.,* 330 U.S. 258, 303-04 (1947).

123.     "The heart of bankruptcy law is the bankruptcy discharge, affording a fresh start by relieving the debtor of liability for certain pre-petition debts." *In re Lempesis*, 557 B.R. 659, 664 (Bankr. N.D. Ill. 2016).

124.    A discharge order "operates as an injunction" against acts to collect discharged debts. 11 U.S.C. §524(a)(2).

125.    "The discharge order is a permanent injunction that provides the debtor with protection that survives the bankruptcy. This injunction is forever applicable to every debt that was discharged by the bankruptcy." *In re Lempesis*, 557 B.R. 659, 664 (Bankr. N.D. Ill. 2016).

126.    "Section 105(a) of the Bankruptcy Code does provide the court with authority to enforce the discharge order." *Wiley v. Mason* (In re Wiley), 224 B.R. 58, 66 (Bankr. N.D. Ill. 1998).

127.     A creditor that attempts to collect a discharged debt is "in contempt of the bankruptcy court that issued the order of discharge." *Cox v. Zale Del., Inc*., 239 F.3d 910, 915 (7th Cir. 2001).

128.     "A violation of the discharge injunction must be willful to warrant a finding of civil contempt and sanctions. 'Willful' requires that the creditor knows about the discharge injunction and intends to commit the acts that violate the injunction. *Daniel Goodman, LLC v. Montgomery* (In re Montgomery), 2013 U.S. Dist. LEXIS 66231, *11 (N.D. Ill. 2013).

129.     "Bankruptcy courts have the authority to award remedial and compensatory damages in the form of sanctions for violations of the discharge injunction." *Romanucci & Blandin, LLC v. Lempesis*, 2017 U.S. Dist. LEXIS 71526, at *16-17 (N.D. Ill. 2017).

130.     "The law is clear that punitive damages may be awarded for violations of the discharge injunction." *Saccameno v. Ocwen Loan Servicing*, 2017 U.S. Dist. LEXIS 185427, at *23 (N.D. Ill. 2017).

131.     "Relevant factors that may be considered in determining whether punitive damages are appropriate for a creditor's violation of the automatic stay (and equally applicable for violations of the discharge injunction) are: (1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; and (4) any provocation by the debtor." *Vazquez v. Sears, Roebuck & Co.* (In re Vazquez), 221 B.R. 222, 231 (Bankr. N.D. Ill. 1998).

132.     Here, there is no question that Andigo had actual knowledge of the Debtor's bankruptcy filing and subject discharge.

133.     Specifically, Andigo was served with the notice of the bankruptcy filing and Discharge Order by the BNC.

134. Moreover, Andigo heavily participated in the Debtor's bankruptcy.

135. Andigo violated the Automatic Stay, Confirmation Order, and Discharge Injunction by (1) attempting to collect pre-petition arrears throughout the Debtor's bankruptcy; (2) applying the Debtor's post-petition payments to pre-petition arrears; (3) holding the Debtor's full payments in suspense instead of applying them to principal and interest; (4) assessing fees to the subject loan without court approval; (5) attempting to collect amounts post-discharge that were paid by the Debtor throughout his bankruptcy; (6) deeming the Debtor in default after the entry of the Discharge Order; (7) repeatedly sending Debtor default notices post-discharge; and (8) repeatedly threatening to foreclosure on the Debtor's home.

136. Andigo's contempt of the Court's orders and mandates of the Bankruptcy Code is especially egregious in light of the fact that (1) the Debtor repeatedly alerted Andigo to its unlawful conduct and inaccurate records and (2) the payment history affixed to Andigo's Response to Notice of Final Cure Payment reflects that Debtor made all post-petition payments that became due after the filing of his bankruptcy.

137. As set forth above, the Debtor has suffered and continues to suffer significant damages as a result of Andigo's willful violations of the Automatic Stay, Confirmation Order, and Discharge Injunction.

138. Punitive damages are appropriate because Andigo brazenly continues its efforts to collect pre-petition arrears despite having *actual knowledge* of the Discharge Injunction.

139. The totality of circumstances demonstrates that Andigo's conduct is willful and that punitive damages are warranted.

140. Courts have repeatedly assessed punitive damages against mortgage companies for willful violations of the discharge injunction. *See e.g. In re Adams,* 2010 Bankr. LEXIS 2207, *11

(Bankr. E.D. N.C. 2010) (assessing punitive damages against a mortgage company in the amount $66,300.00 for its willful violations of the discharge injunction); *In re Perviz,* 302 B.R. 357, 374 (Bankr. N.D. Ohio 2003) (assessing punitive damages against a mortgage company for its willful violations of the discharge injunction); *In re Phillips,* 2012 Bankr. LEXIS 1042, *13 (Bankr. N.D. Ohio 2012) (assessing punitive damages against a mortgage company for its willful violations of the discharge injunction).

141.     Based on the foregoing, the Court should award the Debtor compensatory damages and punitive damages for Andigo's callous disregard of the Discharge Injunction and the bankruptcy process in general. *See* 11 U.S.C. §105 (the Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code).

**WHEREFORE**, pursuant to 11 U.S.C. §105, the Debtor respectfully requests the following relief:

a.   An order finding that Andigo violated the Automatic Stay;

b.   An order finding Andigo in civil contempt of the Court's Order confirming the Debtor's Modified Plan [Dkt. 49];

c.   Enjoining Andigo from further non-compliance of the Court's Order confirming the Debtor's Modified Plan [Dkt. 49];

d.   An order finding that Andigo willfully violated the bankruptcy Discharge Injunction [Dkt. 67];

e.   An order finding that Andigo is in civil contempt of the Discharge Order [Dkt. 67];

f.   An order compelling Andigo to update its records to reflect that the Debtor is current on the subject loan and to retroactively apply all post-petition payments consistently with the Confirmed Plan and applicable bankruptcy provisions;

g.   An order enjoining Andigo from filing foreclosure proceedings against the subject property;

h.   Awarding the Debtor compensatory damages in an amount no less than $75,000.00;

i.   Assessing punitive damages against Andigo in an amount no less than $75,000.00 for its contempt of the Automatic Stay, the Court's Order confirming the Debtor's Modified Plan [Dkt. 49], the Discharge Order [Dkt. 67], and to deter Andigo from future non-compliance;

j.   Awarding the Debtor his attorney's fees and costs;

k.   An order granting certification of the Completed Bankruptcy class, including the designation of the Debtor as the named representative, and the appointment of the undersigned as Class Counsel;

l.   Enjoining Andigo from further non-compliance with the Orders confirming the Completed Bankruptcy class' Chapter 13 plans;

m.   Enjoining Andigo from further non-compliance with the Discharge Orders entered in the Completed Bankruptcy class' bankruptcy cases;

n.   An order compelling Andigo to update its records to reflect and correctly apply all post-petition payments consistent with the Completed Bankruptcy class' confirmed Chapter 13 plans;

o.   An order compelling Andigo to update its records to reflect and correctly apply all post-petition payments consistent with the Discharge Orders entered in the Completed Bankruptcy class' bankruptcy cases;

p.   Awarding the Completed Bankruptcy class compensatory damages in an amount to be determined at an evidentiary hearing after class certification and after members of the Completed Bankruptcy class are identified;

q.   Awarding the Completed Bankruptcy class punitive damages in an amount to be determined at an evidentiary hearing and after class certification and after members of the Completed Bankruptcy class are identified; and

r.   Any further relief that the Court may deem just and proper.

II.   **Andigo Should Be Sanctioned for Violations of Federal Rule of Bankruptcy Procedure 3002.1(b)**

142.   Fed. R. Bankr. P. 3002.1(b) requires the holder of a claim secured by a security interest in the debtor's principal residence  to "file and serve on the debtor, debtor's counsel, and

the trustee a notice of any change in the payment amount, including any change that results from an interest rate or escrow account adjustment, no later than 21 days before a payment in the new amount is due." *See* Fed. R. Bankr. P. 3002.1(b).

143. Andigo violated Rule 3002.1(b) by failing to notify the Debtor, the Debtor's counsel, and the Chapter 13 Trustee of a payment change during the course of the Debtor's bankruptcy. *See* e.g. ¶¶49,52.

144. As set forth above, payment on the subject loan changed and Andigo failed to notify the Debtor, the Debtor's counsel, and the Chapter 13 Trustee of the payment change. *Id.*

145. Pursuant to Rule 3002.1(i), the Debtor has a private right of action against Andigo for its failure to comply with Rule 3002.1(b).

146. As set forth above, the Debtor was significantly harmed by Andigo's non-compliance with Rule 3002.1(b).

147. Upon information and belief, the Debtor is one of hundreds of victims of Andigo's systematic practice of changing mortgage payments without proper notification.

148. As a result of Andigo's failure to comply with Rule 3002.1(b), the Debtor and other bankruptcy debtors were thrown into a perpetual state of confusion, fear, and uncertainty as to the status of their mortgage loans.

149. Moreover, upon information and belief, many bankruptcy debtors defaulted on their mortgage loans due to Andigo's failure to notify the bankruptcy debtors of the payment changes.

**WHEREFORE,** pursuant to Rule 3002.1(i), the Debtor respectfully requests the following relief:

a. Awarding the Debtor compensatory damages in an amount no less than $20,000.00 for Andigo's non-compliance with Rule 3002.1(b);

b. Assessing punitive damages against Andigo for its non-compliance with Rule 3002.1(b) with respect to the Debtor in amount no less than $20,000.00 to deter future non-compliance;

c. Awarding the Debtor his attorney's fees and costs;

d. An order granting certification of the Payment Change Class, including the designation of the Debtor as the named representative, and the appointment of the undersigned as Class Counsel;

e. Enjoining Andigo from further non-compliance with Rule 3002.1(b);

f. Awarding the Payment Change Class compensatory damages in an amount to be determined at an evidentiary hearing after class certification and after members of the Payment Change Class are identified;

g. Awarding the Payment Change Class punitive damages in an amount to be determined at an evidentiary hearing after class certification and after members of the Payment Change Class are identified; and

h. Any further relief that the Court may deem just and proper.

Dated: September 27, 2021                                    Respectfully Submitted,

                                                            /s/ *Mohammed O. Badwan*

                                                            Mohammed O. Badwan, Esq.
                                                            *Counsel for Debtor*
                                                            Sulaiman Law Group, Ltd.
                                                            2500 S. Highland Ave.
                                                            Suite 200
                                                            Lombard, IL 60148
                                                            Phone (630) 575-8180
                                                            Fax: (630) 575- 8188
                                                            mbadwan@sulaimanlaw.com